John Gzikowski    CDCR # D-00666
Ironwood State Prison
P.O. Box 2199
Blythe,  CA  92226-2199



*(PR)*

TEH

JOHN GZIKOWSKI                )
        Petitioner,           )
v.                            )
                              )
DEBRA DEXTER, Warden          )
        Respondent.           )

CV 08        3652

Case No. _____

ATTACHMENT TO PETITION FOR
WRIT OF HABEAS CORPUS

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

**INMATE COPY**

In the matter of the Life )
Term Parole Consideration )      CDC Number D-00666
Hearing of:               )
                          )
JOHN GZIKOWSKI             )
_____)

IRONWOOD STATE PRISON

BLYTHE, CALIFORNIA

JANUARY 3, 2007

PANEL PRESENT:

Archie Joe Biggers, Presiding Commissioner
Carol Bentley, Deputy Commissioner

OTHERS PRESENT:

John Gzikowski, Inmate
Jane Kelly, Attorney for Inmate
Pamela Ann Underwood, Deputy District Attorney
Correctional Officer(s) Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No        See Review of Hearing
_____  Yes       Transcript Memorandum

**Marsha Mees    Northern California Court Reporters**

ii

## INDEX

Page

Proceedings ....................................... 1

Case Factors ..................................... 19

Pre-Commitment Factors ........................... 31

Post-Commitment Factors .......................... 31

Parole Plans ..................................... 37

Closing Statements ............................... 48

Recess ........................................... 51

Decision ......................................... 52

Adjournment ...................................... 55

Transcriber Certification ........................ 56

--oOo--

1

1       **P R O C E E D I N G S**

2           **PRESIDING COMMISSIONER BIGGERS:**  This is a

3       subsequent parole consideration for John Gzikowski,

4       that's G-Z-I-K-O-W-S-K-I.  CDC number is D-00666.

5       Today's is January 3, 2007 and we're located at the

6       Ironwood State Prison.  Inmate was received on

7       February 14, 1985 from San Francisco County.  The life

8       term began on February 14, 1985 and the minimum

9       eligible parole date was February 14, 1985.  That

10      doesn't sound right.  That's a mistake.

11          **INMATE GZIKOWSKI:**  Can I explain?

12          **DEPUTY COMMISSIONER BENTLEY:**  MEPD?

13          **PRESIDING COMMISSIONER BIGGERS:**  Yeah.

14          **DEPUTY COMMISSIONER BENTLEY:**  Yeah, I'll get

15      that for you.

16          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I show

17      it 2-14-85.  You say you have an explanation?

18          **INMATE GZIKOWSKI:**  Yeah.

19          **DEPUTY COMMISSIONER BENTLEY:**  Okay.

20          **INMATE GZIKOWSKI:**  I was originally sentenced to

21      death row.

22          **PRESIDING COMMISSIONER BIGGERS:**  I understand

23      that.

24          **INMATE GZIKOWSKI:**  In (inaudible) all right.

25      When I got the new trial, CDC discharged me off my B

26      number but I'm on the same docket number.  So when I

27      came back in the system (inaudible) seven to life, I

2

1    was under the same docket number but CDC issued me a

2    new serial number.  So while my sentence is running

3    since (inaudible) jail from '78 to '85, I have two CDC

4    numbers.  One's a B number and one's a D number.

5    Therefore, when I came back in under the D number, I

6    already had the minimum amount of time served so I was

7    (inaudible) eligible for --

8         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  All

9    right.  Thank you, sir.  All right.  So we've

10   substantiated that the minimum eligible parole date was

11   February 14, 1985.  The controlling offense for which

12   the inmate has been committed is murder first degree.

13   The case number is 97078.  And it's one count.  It's

14   violation of the Penal Code 187.  There were three

15   additional counts.  One was murder in the first degree.

16   This also was a violation of the Penal Code 187.  Same

17   case number, same county, that was count two.  There

18   was also a count one of use of a firearm which is a

19   violation of PC 12022.5, same count, same case number

20   and that was one count.  And then there was a second

21   count of use of a firearm, which is violation of PC

22   12022.5, same county, the same case number, and that

23   was count two.  Now Mr. Gzikowski, this hearing is

24   being tape recorded.  And for the purpose of voice

25   identification, each of us will state our first and

26   last name, spelling our last name.  When it's your

27   turn, sir, after spelling your last name, please give

1    us your CDC number.  I will start and move to my right.

2    My name is Archie Joe Biggers, B-I-G-G-E-R-S, and I'm a

3    Commissioner with the Board of Parole Hearings.

4         **DEPUTY COMMISSIONER BENTLEY:**  Carol Bentley,

5    B-E-N-T-L-E-Y, Deputy Commissioner.

6         **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  Pamela Ann

7    Underwood, U-N-D-E-R-W-O-O-D, District Attorney from

8    San Francisco.

9         **INMATE GZIKOWSKI:**  John Gzikowski, D double

10   0666.

11        **ATTORNEY KELLY:**  Jane Kelly, attorney for the

12   inmate.

13        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.

14   Before we begin there, Mr. Gzikowski, there's an ADA

15   statement that's right there where (inaudible) there's

16   a yellow sheet of paper.  Would you please read that

17   out loud for us.

18        **ATTORNEY KELLY:**  This is -- I have an ADA

19   problem.

20        **PRESIDING COMMISSIONER BIGGERS:**  No, I'm talking

21   about the inmate.

22        **ATTORNEY KELLY:**  Okay.  Just for the record I

23   suffer from uveitis which is a chronic eye infection

24   which just flared up.  So if I put on my sunglasses,

25   it's not out of disrespect but the lights --

26        **PRESIDING COMMISSIONER BIGGERS:**  No, I -- I read

27   that and I think we had a discussion in 2004 about that

4

1    as well.

2        **ATTORNEY KELLY:**  I didn't -- No, actually I

3    forgot my glasses.

4        **PRESIDING COMMISSIONER BIGGERS:**  You forgot your

5    glasses.  You forgot to bring your purse or something.

6        **ATTORNEY KELLY:**  (Inaudible).

7        **INMATE GZIKOWSKI:**

8            "The Americans With Disabilities Act, ADA,

9            is a law to help people with disabilities.

10           Disabilities are problems that make it

11           harder for some people to see, hear,

12           breathe, talk, walk, learn, think, work or

13           take care of themselves than it is for

14           others.  Nobody can be kept out of public

15           places or activities because of a

16           disability.  If you have a disability, you

17           have the right to ask for help to get

18           ready for your BPT hearing, get to the

19           hearing, talk, read forms and papers and

20           understand the hearing process.  BPT will

21           look at what you asked for to make sure

22           you have a disability that is covered by

23           the ADA and that you have asked for the

24           right kind of help.  If you do not get

25           help or if you don't think you got the

26           kind of help you need, ask for a BPT 1074

27           Grievance Form.  You can also get help to

5

1           fill it out."

2           **PRESIDING COMMISSIONER BIGGERS:**  You understand

3    what you read?  You read it pretty fast.

4           **INMATE GZIKOWSKI:**  Yes, I understand.

5           **PRESIDING COMMISSIONER BIGGERS:**  You do?

6           **INMATE GZIKOWSKI:**  Yes.

7           **PRESIDING COMMISSIONER BIGGERS:**  I see that you

8    signed a BPT Form 1073 on September 20, 2006.  Is that

9    information still correct?

10          **INMATE GZIKOWSKI:**  Yes, it is.

11          **PRESIDING COMMISSIONER BIGGERS:**  Indicated that

12   you had no BP -- no ADA issues.

13          **INMATE GZIKOWSKI:**  That's right.

14          **PRESIDING COMMISSIONER BIGGERS:**  You wear

15   glasses?

16          **INMATE GZIKOWSKI:**  Yeah, I have a prescription.

17   I'm nearsighted.

18          **PRESIDING COMMISSIONER BIGGERS:**  Nearsighted.

19   Do you feel that's going to hinder in reading documents

20   today?

21          **INMATE GZIKOWSKI:**  No.

22          **PRESIDING COMMISSIONER BIGGERS:**  You have any

23   hearing impairments?

24          **INMATE GZIKOWSKI:**  No, I don't.

25          **PRESIDING COMMISSIONER BIGGERS:**  You ever been

26   included in Triple CMS or EOP?

27          **INMATE GZIKOWSKI:**  No.

6

1          **PRESIDING COMMISSIONER BIGGERS:**  You know what

2     those are?

3          **INMATE GZIKOWSKI:**  Yes.

4          **PRESIDING COMMISSIONER BIGGERS:**  What are they?

5          **INMATE GZIKOWSKI:**  They're psychotropic

6     medications.

7          **PRESIDING COMMISSIONER BIGGERS:**  Have you ever

8     taken any psychotropic medication?

9          **INMATE GZIKOWSKI:**  No.

10         **PRESIDING COMMISSIONER BIGGERS:**  How far did you

11    get in school in the streets?

12         **INMATE GZIKOWSKI:**  Twelfth grade, a graduate

13    from high school.

14         **PRESIDING COMMISSIONER BIGGERS:**  Do you suffer

15    from any disability that would prevent you from

16    participating in today's hearing?

17         **INMATE GZIKOWSKI:**  No.

18         **PRESIDING COMMISSIONER BIGGERS:**  Are you a

19    little upset this morning?

20         **INMATE GZIKOWSKI:**  No.

21         **PRESIDING COMMISSIONER BIGGERS:**  I just want to

22    make sure.  You seem like (inaudible).  Something

23    bugging you?

24         **INMATE GZIKOWSKI:**  No.

25         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I'm

26    going to ask your attorney then, does she feel that

27    your ADA rights have been met?

1          **ATTORNEY KELLY:**   Yes.

2          **PRESIDING COMMISSIONER BIGGERS:**   This hearing's

3     being conducted pursuant to Penal Code section 3041 and

4     3042 and the rules and regulations of the Board of

5     Prison Terms governing parole consideration hearings

6     for life inmates.   The purpose of today's hearing is to

7     once again consider the number and the nature of the

8     crime you were committed for, your prior criminal and

9     social history and your behavior and programming since

10    your commitment.   We've had the opportunity to review

11    your Central File and your transcript and you'll be

12    given the opportunity to correct or clarify the record.

13    We will reach a decision today and inform you whether

14    or not we find you suitable for parole and the reason

15    for our decision.   If you are found suitable for

16    parole, the length of your confinement will be

17    explained to you.   Nothing that happens here today will

18    change the finding of the court.   This Panel is not

19    here to retry your case.   This Panel's here for the

20    sole purpose of determining your suitability for

21    parole.   Do you understand that?

22         **INMATE GZIKOWSKI:**   Yes.

23         **PRESIDING COMMISSIONER BIGGERS:**   The hearing's

24    going to be conducted in two phases.   I will discuss

25    with you the crime you were committed -- your prior

26    criminal and social history.   Deputy Commissioner

27    Bentley will then go over your post-conviction factors,

8

1     your psychological evaluation and any parole plans and

2     3042 Notices.  Once that is concluded, Commissioners,

3     the District Attorney and then your attorney will be

4     given the opportunity to ask you questions.  Questions

5     from the District Attorney shall be asked through the

6     Chair and you will direct your answers to the Panel and

7     not to the District Attorney.  Next the District

8     Attorney, then your attorney and then you will be given

9     an opportunity to make a final statement regarding your

10    parole suitability.  Your statement should address why

11    you feel you're suitable for parole.  The Panel will

12    then recess, clear the room and deliberate.  Once the

13    deliberations are complete, the Panel will resume the

14    hearing and announce its decision.  Now the California

15    Code of Regulations states that regardless of time

16    served a life inmate shall be found unsuitable for and

17    denied parole if in the judgment of the Panel the

18    inmate would pose an unreasonable risk of danger to

19    society if released from prison.  You have certain

20    rights.  Those rights include a right of the timely

21    notice of this hearing, the right to review your

22    Central File, and I see that you declined to review

23    your Central File.  Is there a reason for that, sir?

24          **INMATE GZIKOWSKI:**  None in particular.  I've

25    been through it so many times.

26          **PRESIDING COMMISSIONER BIGGERS:**  You also have

27    the right to present relevant documents.  And I'm going

1    to ask your attorney, not at this point to present the
2    documents, do you have -- feel that your rights have
3    been met?

4         **ATTORNEY KELLY:** I do not feel my client's
5    rights have been met at all.

6         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  That's
7    fine.

8         **ATTORNEY KELLY:** I have several objections.
9    I'll start with the fact that I had an appointment to
10   meet with Mr. Gzikowski this morning.  When I showed
11   up, I was told that I couldn't see him at all and that
12   the hearing was being postponed.  Only after major
13   objections to your Warden was I given approximately 15
14   minutes behind glass to meet Mr. Gzikowski, which is
15   not sufficient.  But I do not want another
16   postponement.  There are several other objections I
17   want in this record.  Number one, we showed up for a
18   hearing here in 2005 at which point we were promised
19   that there would be an investigation of the
20   confidential file because there was a finding of
21   suitability and it was then overturned after -- based
22   on a confidential file.  When we showed up, nobody
23   bothered to read anything.  I understand again today
24   that despite my effort in providing a memorandum to
25   this Board that nobody's read it.  It's not been given
26   to you.  I have copies here and I would ask you to
27   review them because it's essential.  I believe that

10

1    you're here to do your job and I want you to be able to

2    do it.  But if I give you information, and this is the

3    second time, and nobody bothers to read it, how can you

4    do your job and why am I even trying?

5        **PRESIDING COMMISSIONER BIGGERS:**  Well first of

6    all, before you start, in the way of confidential

7    information, when we get to the point in the hearing

8    when we will outline it that we do have confidential

9    information, if we use it, then we will let you know

10   that we have used the confidential information.

11       **ATTORNEY KELLY:**  That's not the point.

12       **PRESIDING COMMISSIONER BIGGERS:**  Hang on.  There

13   was also an investigation done and we do have a copy of

14   the investigation.

15       **ATTORNEY KELLY:**  Okay.  I had requested that I

16   be given copies of the transcript of the prior hearing.

17   I've never received that.  I asked for a copy of the

18   investigator's report that Mr. Lee promised us at the

19   time we were postponed for 15 months.  I never received

20   that.  I asked also for a copy of the report showing

21   that the parole plans had been investigated thoroughly

22   when Mr. Gzikowski was found suitable in 2004.  I never

23   received any of the above.  So things that are normally

24   provided have not been provided in this case.  And that

25   troubles me greatly.  I also would point out that there

26   was a finding of suitability and the reversal was based

27   on this confidential file.  So how we got to where we

11

1  are today is we came back after the finding of the

2  suitability and we never had a hearing in October of

3  '05.   What we had was a postponement to today and a

4  promise to investigate.   The only thing before this

5  Board, the only thing that we're prepared to talk about

6  today is whether or not there's any information in that

7  file that would really in fact overturn the prior

8  finding of suitability.   To go back to square one at

9  this point I would object to strenuously.

10      **PRESIDING COMMISSIONER BIGGERS:**   Well first of

11  all, that hearing that was done in 2004 was done by a

12  different Panel and we're not -- we are -- whenever you

13  have a new hearing, it's just like that hearing never

14  -- never took place.   So we are going to go back to

15  square one.

16      **ATTORNEY KELLY:**   Well my objection is on the

17  record.   We -- To talk about a crime that happened over

18  28 years ago frankly seems absurd at this point.

19  Whatever he's done, he's acknowledged way back when.

20  And what we would like to talk about is what it is that

21  is keeping this man in prison after 28 years on a

22  sentence of --

23      **PRESIDING COMMISSIONER BIGGERS:**   We're going to

24  go through the hearing just as if -- It's a brand new

25  hearing now.   Your objections are noted.   Let's take a

26  five minute recess real quick.

27      **ATTORNEY KELLY:**   Could I give you the copies --

12

1        **PRESIDING COMMISSIONER BIGGERS:**  Yes, you can.

2        **ATTORNEY KELLY:**  -- to read.  I actually have

3    three copies so that the District Attorney could read

4    it as well.  And I apologize, my staple came out of the

5    last one.  But may I approach?

6        **PRESIDING COMMISSIONER BIGGERS:**  Sure.

7        **ATTORNEY KELLY:**  If you could just kind of hold

8    it together.  Thank you.

9        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You can

10   take him out (inaudible).

11       **ATTORNEY KELLY:**  Did you want us to step out

12   while you're doing this?

13       **PRESIDING COMMISSIONER BIGGERS:**  Please.

14   Please.  All of you please.

15                    [Off the record]

16       **DEPUTY COMMISSIONER BENTLEY:**  Back on record.

17       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Let the

18   record reflect that everyone that was in the room prior

19   to us going into a short recess are now back in the

20   room.  (Inaudible) recess because I wanted to just go

21   and check on a few things through my Title 15.  Let me

22   just address some of your objections, ma'am.  First of

23   all on the transcript.  The transcript is sent to the

24   inmate.  And you could have gotten it from the inmate

25   or you could purchase one from Sacramento.  As to the

26   investigation, the investigation was in fact done.  And

27   it has been placed in the confidential folder.  And the

1    material that they found through the investigation

2    indicated that the letters did not appear to be

3    (inaudible).  On the prior Panel, Title 15 indicates

4    that new Panels are not bound by previous decisions.

5    As for the institution, they have certain rules and

6    regulations that we don't get involved with as to who

7    they allow in and the method in which they allow people

8    in.  So I think that covers all of your objections at

9    this point.  Okay.

10        **ATTORNEY KELLY:**  Just for the record, my client

11    did not receive the transcript.

12        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

13        **ATTORNEY KELLY:**  It was not received by him and

14    I have been at many parole hearings and it's also

15    provided to the attorney.  If there's a transcript, I'd

16    certainly like the opportunity to review it.  He has

17    not received that and I think that, you know, the rules

18    are not being followed and that's what's troubling me

19    so much about this hearing.  But we'll get more into

20    that.  I have some sections of the Title that I'd be

21    happy to get into now if you wish.

22        **PRESIDING COMMISSIONER BIGGERS:**  (Inaudible).

23        **ATTORNEY KELLY:**  I suggest you look at CCR 3316

24    that says the inmate may request the presence of a

25    witness at the hearing who can present facts related to

26    charges against him.  If the prior Board -- And I

27    assume this Board is going to be looking at the

14

1   confidential file, it's like putting us in a fighting

2   ring blindfolded, I have no idea.  We can only surmise

3   what it is that the objections are to his release.

4   Mr. Gzikowski did a lengthy dissertation on what he

5   believed was in that file, which I presented several

6   months ago.  It went to the Parole Board when Mr. Lee

7   was still involved.  That was mailed, hold on a minute,

8   many, many months ago so that there'd be ample

9   opportunity for the review.  It troubles me greatly

10  that these things are not in there.  July 23, 2006 I

11  mailed this to the Parole Board in Sacramento and asked

12  that it be reviewed.  How is it that we showed up here

13  15 months ago, nobody reading the file and here we are

14  today and nobody gave you the file.  I'm not

15  criticizing you.  I'm sure you're trying to do a fair

16  and adequate job, but I'm doing what I'm supposed to

17  do.  And the information is not being provided.  That's

18  very troublesome.  And it's a clear objection.  The

19  last -- excuse me.  Following the last hearing, the

20  real issue came up is confidential information and

21  parole plans.  And it seems like the crux of the

22  problem was this confidential file.  And again, we're

23  in the dark there.  I'll get into more argument later.

24  I would point out that subsection 3321 of Title 15 also

25  says -- subsection B1 -- no decision shall be based

26  upon information from a confidential source unless

27  other documentation corroborates information.  You can

15

1    read that section.  But it's pretty clear on that.

2           **PRESIDING COMMISSIONER BIGGERS:**  (Inaudible) go

3    ahead.

4           **DEPUTY COMMISSIONER BENTLEY:**  (Inaudible) this.

5           **PRESIDING COMMISSIONER BIGGERS:**  Yes, please.

6           **DEPUTY COMMISSIONER BENTLEY:**  We have not ruled

7    that we're going to use any confidential information.

8           **ATTORNEY KELLY:**  It was the reason --

9           **DEPUTY COMMISSIONER BENTLEY:**  Why don't you --

10          **ATTORNEY KELLY:**  Okay.

11          **DEPUTY COMMISSIONER BENTLEY:**  -- make those

12   objections if we say we're going to use them?

13          **PRESIDING COMMISSIONER BIGGERS:**  (Inaudible).

14          **ATTORNEY KELLY:**  Okay.  Do you want to tell me

15   now so we can go forward?

16          **PRESIDING COMMISSIONER BIGGERS:**  No, we'll get

17   to it in just a second.  You have any other questions

18   (inaudible)?

19          **ATTORNEY KELLY:**  I'm sure I will be.

20          **PRESIDING COMMISSIONER BIGGERS:**  I'm sure you

21   will too.

22          **ATTORNEY KELLY:**  You know, but we can get into

23   that argument if you want to proceed, fine.  I just

24   feel very strongly that going back over --

25          **PRESIDING COMMISSIONER BIGGERS:**  This is a new

26   hearing, ma'am.  I mentioned that to you once before.

27          **ATTORNEY KELLY:**  My objection is stated.

16

1       **PRESIDING COMMISSIONER BIGGERS:**  Well, you know,
2    first of all, we're not going to get into an argument
3    at this point.  We understand that you have a vested
4    interest in this situation as well.  And I think we
5    should put that on the record.  Okay.  So now --

6       **ATTORNEY KELLY:**  I never kept that -- I've never
7    suggested otherwise.

8       **PRESIDING COMMISSIONER BIGGERS:**  Well, I'm
9    putting on the record that you have.  And we're going
10   to proceed.

11      **ATTORNEY KELLY:**  It's in my brief and everything
12   else I've ever --

13      **PRESIDING COMMISSIONER BIGGERS:**  Ma'am, we're
14   going to proceed.

15      **ATTORNEY KELLY:**  That's fine.

16      **PRESIDING COMMISSIONER BIGGERS:**  Thank you,
17   ma'am.  Now, Mr. Gzikowski, you are not required to
18   admit your offense or discuss your offense.  However,
19   the Panel does accept the findings of the court to be
20   true.  Do you understand this?

21      **INMATE GZIKOWSKI:**  Yes.

22      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Now I'm
23   going to ask the Deputy Commissioner if any
24   confidential material will be used?

25      **DEPUTY COMMISSIONER BENTLEY:**  There is
26   confidential material, and if we use it, we will so
27   advise.

17

1     **PRESIDING COMMISSIONER BIGGERS:**   Thank you.   I'm

2     going to pass -- I'm going to ask the officer to come

3     up.   I'm going to pass to the District Attorney and to

4     your attorney, sir, what I'm going to mark as Exhibit

5     One, which is a copy of the parole consideration

6     hearing checklist to ensure that we're all operating --

7     all operating off the same set of documents.

8          **ATTORNEY KELLY:**   We're not -- We haven't seen

9     the last hearing transcript.

10         **PRESIDING COMMISSIONER BIGGERS:**   Noted.   Pass it

11    over to the District Attorney please.

12         **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**

13    Commissioner, I have two lists.   I had two packets that

14    I received.

15         **PRESIDING COMMISSIONER BIGGERS:**   There are two

16    packages.

17         **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**   And the

18    first packet, if I may show the Commissioner.

19         **PRESIDING COMMISSIONER BIGGERS:**   Sure.

20         **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**   Is one set

21    of lists.   And then this is the -- this one I agree --

22    but I just wanted you to know that I had another list

23    as well.   If I may approach?

24         **DEPUTY COMMISSIONER BENTLEY:**   (Inaudible).

25         **PRESIDING COMMISSIONER BIGGERS:**   Please.

26         **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**   If you

27    would like.   I didn't know if that would make a

18

1  difference or not.  Here's the list.  And then I had a

2  first file.

3      **PRESIDING COMMISSIONER BIGGERS:**  That first file

4  didn't have anything on it.  It was just -- They put

5  this on all of (inaudible) they didn't check -- make

6  any checks on it at all.

7      **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  I thought

8  the top boxes were checked.  (Inaudible).  All right.

9      **PRESIDING COMMISSIONER BIGGERS:**  Thank you.

10     **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  Thank you.

11     **PRESIDING COMMISSIONER BIGGERS:**  At this point,

12  do you have any additional documents?

13     **ATTORNEY KELLY:**  Yes, I do.  I have additional

14  petitions, we probably have about several file boxes of

15  these, but we have more.  And I have copies of letters

16  that were sent out searching for our parole -- job.

17     **PRESIDING COMMISSIONER BIGGERS:**  Thank you.

18  (Inaudible) please.  Do you have any other preliminary

19  objections?

20     **ATTORNEY KELLY:**  I'm sorry, I didn't --

21     **PRESIDING COMMISSIONER BIGGERS:**  Any preliminary

22  objections?

23     **ATTORNEY KELLY:**  Not at this point.

24     **PRESIDING COMMISSIONER BIGGERS:**  Other than the

25  ones that you stated?

26     **ATTORNEY KELLY:**  I think I've stated them.

27     **PRESIDING COMMISSIONER BIGGERS:**  Thank you.

19

1    Will your client be speaking to the Panel, ma'am?

2            **ATTORNEY KELLY:** I believe he will.

3            **PRESIDING COMMISSIONER BIGGERS:** Thank you.

4    Please raise your right hand as best as you can please,

5    sir.  Do you solemnly swear or affirm that the

6    testimony you give at this hearing will be the truth

7    and nothing by the truth?

8            **INMATE GZIKOWSKI:** Yes.

9            **PRESIDING COMMISSIONER BIGGERS:** Thank you.  I'm

10   going to read into the record Statement Of Facts from

11   the probation officer's report.

12           "On April 20, 1978 at approximately 1:30

13           a.m. defendant was a passenger -- we'll

14           call him in the inmate -- was a passenger

15           in a pickup truck being driven by

16           codefendant Raul -- and I'll spell the

17           last name -- V-I-L-L-A-S-E-N-O-R, when

18           they drove up beside the victim's 1968

19           Cadillac which was parked on Market Street

20           just east of Seventh.  Several witnesses

21           saw the inmate raise a shotgun and fire

22           three shots at the two victims in the

23           Cadillac.  Raymond Velonza, V-E-L-O-N-Z-A,

24           and Gary Orasis, O-R-A-S-I-S, each

25           suffered (inaudible) wound to the head and

26           died instantly.  Immediately after the

27           shooting, the codefendant accelerated his

20

1          truck and drove east on Market to Sixth

2          when he turned right.  An officer in a

3          patrol car on Jones and Market Street

4          heard the gunshot and drove down Market in

5          pursuit of the defendants.  On Mission

6          Street the defendant's truck turned right

7          and headed west to about mid-block when he

8          turned into a parking lot, followed by two

9          patrol cars which effected a stop of the

10         truck.  Defendant was ordered out of the

11         vehicle and placed under arrest.  The

12         shotgun was seized and a search of the --

13         inside the truck cab revealed a loaded .38

14         revolver inside the driver's seat."

15         That pretty much what took place, sir?

16         **INMATE GZIKOWSKI:**  Yes.

17         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I have a

18    couple of questions about that.  When they first

19    stopped you, okay, why did you go back?

20         **INMATE GZIKOWSKI:**  When they first --

21         **PRESIDING COMMISSIONER BIGGERS:**  After you went

22    home, right?

23         **INMATE GZIKOWSKI:**  No.  You mean the crime?

24         **PRESIDING COMMISSIONER BIGGERS:**  Yes.

25         **INMATE GZIKOWSKI:**  Anger.

26         **PRESIDING COMMISSIONER BIGGERS:**  Anger?

27         **INMATE GZIKOWSKI:**  Yeah, a rush to judgment.

21

1    False pride, false ego.   Inability to control my

2    initial responses.

3            **PRESIDING COMMISSIONER BIGGERS:**   Because in

4    reading the -- not only the transcript but reading the

5    history in your file, you indicated you were worried

6    about the safety of your family.

7            **INMATE GZIKOWSKI:**   I was.

8            **PRESIDING COMMISSIONER BIGGERS:**   What made your

9    car so different from any of the other cars?

10           **INMATE GZIKOWSKI:**   It was a '75 Chevy hotrod.

11           **PRESIDING COMMISSIONER BIGGERS:**   That was the

12   only one like that in San Francisco?

13           **INMATE GZIKOWSKI:**   Just about, yeah.   And they

14   did mention it.   But you know, while all that's

15   relevant --

16           **PRESIDING COMMISSIONER BIGGERS:**   Excuse me?

17           **INMATE GZIKOWSKI:**   While all that is relevant,

18   the real reason is that I made a rush to judgment and I

19   had an incorrect response which I should have called

20   the authorities.   That's the bottom line.   We can talk

21   all day about social circumstances, my being

22   unemployed, my not wanting to ask my relatives for

23   help, all that (inaudible) relevant in my mind, but the

24   bottom line is I committed the crime, I was guilty and

25   I made an incorrect decision which forever changed the

26   lives of the victims.   And let me -- let me go back to

27   that.   The victims had an extensive criminal history

1    too.   I believe one was out on bail.

2         **PRESIDING COMMISSIONER BIGGERS:**   Well what does

3    that have to do with the crime, sir?

4         **INMATE GZIKOWSKI:**   Because when he threatened

5    me, I understood where they were coming from.   I

6    related to them and I responded in kind to their

7    actions.

8         **PRESIDING COMMISSIONER BIGGERS:**   But what does

9    it have to do with you going back there?

10        **INMATE GZIKOWSKI:**   It doesn't.

11        **PRESIDING COMMISSIONER BIGGERS:**   Then why did

12   you bring it up?

13        **INMATE GZIKOWSKI:**   Because it's never been

14   mentioned before.   Since we're rehashing -- Since I am

15   being (inaudible) forced to go back to day one in this

16   hearing here, let's get it all out.   I didn't kill two

17   priests.   I killed two criminals.

18        **PRESIDING COMMISSIONER BIGGERS:**   Doesn't matter.

19   You still killed two individuals.

20        **INMATE GZIKOWSKI:**   And I'm -- And I've held

21   myself responsible for it ever since.   I've done 28

22   years in prison.   I can't change what I did.   I can't

23   change it.   I wish I could but I can't.   I've never

24   denied the responsibility for this crime, ever.   Ever.

25   I was sentenced to death.   I didn't try to save my own

26   life.   I took the stand, told everybody I killed them

27   and why.   And here I am 28 years later.   I'm still

23

1    being forced to relive what I did 28 years ago.

2        **PRESIDING COMMISSIONER BIGGERS:**  That's the

3    process, sir.

4        **INMATE GZIKOWSKI:**  That's the process.  When is

5    it going to stop?  When do I get out of prison?  When

6    do I go home?  When can I have my life back?  I've

7    worked so hard.  I've worked so hard.

8        **PRESIDING COMMISSIONER BIGGERS:**  All right.

9    We're not -- Okay.  You claim that you were in danger

10   and you were worried about your daughter and then you

11   were under stress.  This is what I read in the file.

12   And now you're saying that was not the issue?

13       **INMATE GZIKOWSKI:**  No, that wasn't the issue.

14       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  When did

15   you suddenly decide that that wasn't?  When did you

16   change your story?  Because everything that I read up

17   until, you know, several years ago it was because of

18   those things.

19       **INMATE GZIKOWSKI:**  It was because -- I'm trying

20   -- I'm trying to connect with you.  In 1978 those were

21   the issues, but the bottom line is I committed the

22   crime.

23       **PRESIDING COMMISSIONER BIGGERS:**  Understand

24   that, sir.

25       **INMATE GZIKOWSKI:**  And that's all I'm trying to

26   say to you.  The bottom line is I committed the crime

27   and I'm holding myself responsible for it.

24

1       **PRESIDING COMMISSIONER BIGGERS:** Sir, we're well
2   aware of that. What I'm trying to find out is your
3   rationale and your thinking --

4       **INMATE GZIKOWSKI:** My rationale in 1978 --

5       **PRESIDING COMMISSIONER BIGGERS:** Let me finish
6   please.

7       **INMATE GZIKOWSKI:** Yes.

8       **PRESIDING COMMISSIONER BIGGERS:** Your rationale
9   and why you did this so that when I start talking about
10   the causative factors which led you to do that, that I
11   can weigh all of those odds. Okay. I understand that
12   you have taken full responsibility for that. Now, you
13   indicated that those individuals that you shot were
14   criminals, is that -- so are you telling me you didn't
15   have any remorse for them because they were in fact
16   criminals?

17       **INMATE GZIKOWSKI:** No.

18       **PRESIDING COMMISSIONER BIGGERS:** Describe your
19   feelings of remorse towards the victims.

20       **INMATE GZIKOWSKI:** When I was in trial when I
21   was getting sentenced to death, their grandfather's in
22   court. And I'll never forget that look on his face.
23   I'll never forget the look on his face and the faces of
24   all the relatives. I'll never forget the look on my
25   wife's face. I'll never forget the look on the court's
26   face. I carry those memories everyday of my life. To
27   sit in front of you trying to explain remorse would be

1    combining the last 28 years in a five or 10 second

2    statement, I can't do that.  All I can do is everyday

3    of my life try to show that I am suitable for parole

4    and I can be trusted.  And I've done everything within

5    my capacity to do that during my incarceration.

6          **PRESIDING COMMISSIONER BIGGERS:**  You a member of

7    the Hell's Angels also.  Is that correct?

8          **INMATE GZIKOWSKI:**  Yes.

9          **PRESIDING COMMISSIONER BIGGERS:**  And you

10   indicated back in '98 that you would always be a member

11   of the Hells Angels.

12         **INMATE GZIKOWSKI:**  Yes.

13         **PRESIDING COMMISSIONER BIGGERS:**  Is that

14   correct?  Is that your feeling today?

15         **INMATE GZIKOWSKI:**  Yes.

16         **PRESIDING COMMISSIONER BIGGERS:**  And you also

17   stated that the -- this crime had nothing to do with

18   the gang affiliation?

19         **INMATE GZIKOWSKI:**  It had nothing to do with it.

20         **PRESIDING COMMISSIONER BIGGERS:**  But earlier you

21   mentioned that you had anger and you had pride and

22   stuff.  Where did that all that come from if it was not

23   part of the --

24         **INMATE GZIKOWSKI:**  Things -- Things from my

25   prior criminal conviction when I did time in Illinois.

26         **PRESIDING COMMISSIONER BIGGERS:**  So you're

27   saying that pride that you had, had nothing to do with

27

1    And you indicated that you wondered when you're going

2    to get your life back, right.  Well when is Mr. Velonza

3    and Mr. Orasis -- they don't get a life back.

4         **INMATE GZIKOWSKI:**  They never will.  And there's

5    nothing I can do about that now.  But my point is, how

6    can I convey to you of my remorse within this setting.

7    I can't give their lives back.  I can't do anything to

8    take back what I did.  I wish I could but I can't.

9         **DEPUTY COMMISSIONER BENTLEY:**  Okay.  Those are

10   the only questions I had.

11        **PRESIDING COMMISSIONER BIGGERS:**  All right.

12   Thank you.  I'm going to move to your social history at

13   this point, sir.  You were born May 24, 1950.

14        **INMATE GZIKOWSKI:**  Yes.

15        **PRESIDING COMMISSIONER BIGGERS:**  In Pittsburg,

16   Pennsylvania to Joseph and Anna?

17        **INMATE GZIKOWSKI:**  Yes.

18        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Your

19   parents, are they still living?

20        **INMATE GZIKOWSKI:**  No, they died in 1996.

21        **PRESIDING COMMISSIONER BIGGERS:**  You had a

22   brother?

23        **INMATE GZIKOWSKI:**  Yes.

24        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You also

25   (inaudible) joined the Marine Corps.  What was your

26   MOS?

27        **INMATE GZIKOWSKI:**  Zero three 11.

28

1          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  You were

2     discharged two years later in 1970.

3          **INMATE GZIKOWSKI:**  Yes.

4          **PRESIDING COMMISSIONER BIGGERS:**  Did you get an

5     honorable discharge?

6          **INMATE GZIKOWSKI:**  Yes.

7          **PRESIDING COMMISSIONER BIGGERS:**  And then you

8     had two -- you were sent to Illinois State Prison in

9     July 1972.  Is that correct?

10         **INMATE GZIKOWSKI:**  Yes.

11         **PRESIDING COMMISSIONER BIGGERS:**  We'll get into

12    that a little bit later on.  I see here also that you

13    say that you haven't been involved in drugs.  Is that

14    correct?

15         **INMATE GZIKOWSKI:**  At the time, yes.

16         **PRESIDING COMMISSIONER BIGGERS:**  You were or you

17    were not?

18         **INMATE GZIKOWSKI:**  I was not.

19         **PRESIDING COMMISSIONER BIGGERS:**  I read in your

20    files where you said you've never taken drugs but --

21         **INMATE GZIKOWSKI:**  I've never taken drugs.

22         **PRESIDING COMMISSIONER BIGGERS:**  -- sold drugs.

23         **INMATE GZIKOWSKI:**  Sold it.

24         **PRESIDING COMMISSIONER BIGGERS:**  You were

25    married August 1978 while you were in custody in the

26    county jail.

27         **INMATE GZIKOWSKI:**  Yes.

29

1        **PRESIDING COMMISSIONER BIGGERS:**  And you all

2    lived together since 1974 and you have a daughter

3    Crystal.

4        **INMATE GZIKOWSKI:**  Yes.

5        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  And she

6    was born in '76.  You and your wife were divorced in

7    1981.  Then you married Miss Kathleen Romas (phonetic)

8    in 1985.

9        **INMATE GZIKOWSKI:**  Yes.

10       **PRESIDING COMMISSIONER BIGGERS:**  And she has two

11   children.  Do you keep in contact with your children?

12       **INMATE GZIKOWSKI:**  No, I don't.

13       **ATTORNEY KELLY:**  Just for the record, he only

14   has one child.

15       **PRESIDING COMMISSIONER BIGGERS:**  One child but I

16   would assume if he married this lady (inaudible).

17       **ATTORNEY KELLY:**  It was during prison.

18       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  So just

19   -- you only have one child?

20       **INMATE GZIKOWSKI:**  Yes.

21       **PRESIDING COMMISSIONER BIGGERS:**  And you don't

22   keep in contact with them?

23       **INMATE GZIKOWSKI:**  No.

24       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Is there

25   anything I left out -- your social history that you'd

26   like to put on the record, sir?

27       **INMATE GZIKOWSKI:**  No.

30

1       **PRESIDING COMMISSIONER BIGGERS:**  You have any

2   questions?

3       **DEPUTY COMMISSIONER BENTLEY:**  No, I don't.

4       **PRESIDING COMMISSIONER BIGGERS:**  Let's look at

5   your priors.  You had no juvenile record.  And under

6   your adult convictions you were -- in 1971 you were

7   arrested and found guilty of two counts of selling a

8   controlled substance.

9       **INMATE GZIKOWSKI:**  Yes.

10      **PRESIDING COMMISSIONER BIGGERS:**  And you were

11  sentenced to Illinois State Prison for one and a half

12  to three years.  And in '73 you were paroled to

13  California and you were discharged in 1975.  Is that

14  correct?

15      **INMATE GZIKOWSKI:**  Yes.

16      **PRESIDING COMMISSIONER BIGGERS:**  You had a

17  reckless driving in '75 in California, vandalism in

18  '77, driving with a suspended license in '77 in San

19  Francisco and Reno.  And then the current offense.  Is

20  that correct?

21      **INMATE GZIKOWSKI:**  Yes.

22      **PRESIDING COMMISSIONER BIGGERS:**  Is there

23  anything I left out on your adult priors?

24      **INMATE GZIKOWSKI:**  No.

25      **PRESIDING COMMISSIONER BIGGERS:**  Counsel, is

26  there anything you want to add to either one of those,

27  the social or the priors?

31

1    **ATTORNEY KELLY:**  No.

2    **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Thank

3    you.  At this point then I'm going to ask Deputy

4    Commissioner Bentley to go over your post-conviction

5    factors.

6    **DEPUTY COMMISSIONER BENTLEY:**  Okay.  As we

7    discussed, your last Board hearing was September 7,

8    2004.  You had a couple scheduled in the meantime but

9    they've had (inaudible) postponed.  You came in on your

10    life sentence in February of '85 and you've been here

11    at Ironwood since January 2004.  Your classification is

12    currently 28 which is the lowest you can receive.  And

13    you have on your life term four 115's and the last one,

14    as has been mentioned, was February 14, 2003 which was

15    excessive contact.  And you've had only two counseling

16    chronos and those are really going clear back to '81

17    (inaudible) part of the life term.  You've done a good

18    job upgrading vocationally.  You've got over 3,000

19    hours in Machine Repair.  Would you say that that's

20    still current and real marketable?  It was 2000 and

21    (inaudible) --

22    **INMATE GZIKOWSKI:**  Yes, Ma'am.

23    **DEPUTY COMMISSIONER BENTLEY:**  -- certificate.

24    Okay.  And then also you're an Apprentice Welder.

25    **INMATE GZIKOWSKI:**  I'm a journeyman now.

26    **DEPUTY COMMISSIONER BENTLEY:**  A journeyman?

27    **INMATE GZIKOWSKI:**  Yes, Ma'am.

32

1    **DEPUTY COMMISSIONER BENTLEY:** Okay. And you

2    still have your license in that?

3    **INMATE GZIKOWSKI:** Yes, I graduated from the

4    Apprenticeship Program in DVI.

5    **DEPUTY COMMISSIONER BENTLEY:** Okay.

6    **INMATE GZIKOWSKI:** I was the last one to get it.

7    **DEPUTY COMMISSIONER BENTLEY:** All right. And so

8    you have a couple of very marketable skills.

9    **INMATE GZIKOWSKI:** Yes, Ma'am.

10    **DEPUTY COMMISSIONER BENTLEY:** Okay. And your

11    work assignments, are you still a Porter?

12    **INMATE GZIKOWSKI:** Yes, Ma'am.

13    **DEPUTY COMMISSIONER BENTLEY:** Okay. And you've

14    been getting average to above average work reports. I

15    noticed that back in '89 you were involved in

16    self-help.

17    **INMATE GZIKOWSKI:** Yes, Ma'am.

18    **DEPUTY COMMISSIONER BENTLEY:** And then in the

19    '90s you were in some of the counseling programs that

20    they had to offer at that time. I've noticed you've

21    taken college courses. How many credits do you have?

22    **INMATE GZIKOWSKI:** I can't remember. I took a

23    Business Management course and another one, it was,

24    just a couple, it was Cultural Anthropology. Those are

25    the only ones I've taken.

26    **DEPUTY COMMISSIONER BENTLEY:** Okay. All right.

27    And what do you do in your spare time?

1       **INMATE GZIKOWSKI:**   Write letters and read.

2       **DEPUTY COMMISSIONER BENTLEY:**   Okay.

3       **INMATE GZIKOWSKI:**   And exercise.

4       **DEPUTY COMMISSIONER BENTLEY:**   All right.

5   Because I didn't see -- going back in the '90s there

6   were a lot of programs you were involved in.  Is there

7   not anything available here?

8       **INMATE GZIKOWSKI:**   Well again we go back to why

9   I'm here.  I was -- I assumed that I was just coming

10   back to resolve the confidential information and the

11   parole plans and I wasn't suspected anything --

12   expecting any of this and I was told at the last

13   hearing I was on hold until they resolved the

14   confidential information.

15       **DEPUTY COMMISSIONER BENTLEY:**   Well, you were

16   misinformed because that, through the en banc process,

17   was overturned and so that decision was disapproved

18   (inaudible) decision, so that's why we're having the

19   new hearing today.  But even -- you are given a date,

20   you never know what's going to happen, I know the last

21   Panel cautioned you on this, it goes through an

22   extensive review, including the Governor.  So it is

23   always helpful if you continue to program in a positive

24   manner.  Let's see now, you were married twice before

25   you came in and then you got married in 1989 to

26   (inaudible) Rawlins.

27       **INMATE GZIKOWSKI:**   (Inaudible).

34

1       **DEPUTY COMMISSIONER BENTLEY:**  (Inaudible).  And
2    how did you meet her?

3       **INMATE GZIKOWSKI:**  Through letters, she was at a
4    friend's house and I called one day.

5       **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And then
6    that didn't last very long.

7       **INMATE GZIKOWSKI:**  No.  What happened was, we
8    were on a family visit and I was watching a football
9    game and she asked me if this was all there was, and I
10   said, yes, it is.

11      **DEPUTY COMMISSIONER BENTLEY:**  Okay.  All right.
12   Because then you got married a little over a year later
13   to Mary Asaro (phonetic) and that lasted quite awhile,
14   right?

15      **INMATE GZIKOWSKI:**  Yes.

16      **DEPUTY COMMISSIONER BENTLEY:**  Okay.  I think
17   that ended in 2002?

18      **INMATE GZIKOWSKI:**  Yes.

19      **DEPUTY COMMISSIONER BENTLEY:**  And how did you
20   meet her?

21      **INMATE GZIKOWSKI:**  She was working down at the
22   motorcycle shop.

23      **DEPUTY COMMISSIONER BENTLEY:**  You knew her from
24   before?

25      **INMATE GZIKOWSKI:**  No, she was working at the
26   motorcycle shop and happened to get my name and wrote
27   me a letter.

35

1        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  Where was

2    the shop?

3        **INMATE GZIKOWSKI:**  In San Francisco.

4        **DEPUTY COMMISSIONER BENTLEY:**  In San Francisco.

5    Okay.  All right.  What else do you want to tell me

6    about what you've been doing in prison to make yourself

7    more suitable for parole?

8        **INMATE GZIKOWSKI:**  I don't think I can make

9    myself any more suitable.  I really don't.  I've done

10   everything there is.  I enjoyed doing it, but I'm

11   56-years-old, I'm burning out.

12       **DEPUTY COMMISSIONER BENTLEY:**  You're still

13   young.

14       **INMATE GZIKOWSKI:**  Yeah, but you know, I'm burnt

15   out of doing this, and if I'm not going to be found

16   suitable for parole, I'm not going to do it anymore.

17   I'm just going to sit here and die in prison.

18       **DEPUTY COMMISSIONER BENTLEY:**  Okay.  Well the

19   Penal Code, well, I'm sure you're familiar with it,

20   indicates that we are to consider all the circumstances

21   in determining suitability.

22       **INMATE GZIKOWSKI:**  Right.

23       **DEPUTY COMMISSIONER BENTLEY:**  And we are to

24   consider the commitment offense.  All right.  Your

25   psychological report was done by Dr. Payne back in

26   2004.  Goes through your prior history that

27   Commissioner Biggers has already discussed and your --

1    because he mentions under substance abuse that you
2    indicated that you didn't have any substance abuse
3    problems.   When you were arrested for driving under the
4    influence, was that alcohol?

5        **INMATE GZIKOWSKI:**   When they arrested me that
6    night, it was because I was speeding.   When they took
7    me to jail, they took my blood, found out (inaudible)
8    so that was a reckless driving, it was dropped to
9    reckless driving.

10       **DEPUTY COMMISSIONER BENTLEY:**   Okay.

11       **INMATE GZIKOWSKI:**   I was not arrested.

12       **DEPUTY COMMISSIONER BENTLEY:**   Okay.   And he
13   gives you under the diagnosis under Axis I and II he
14   has No Diagnosis.   And he gives you a GAF score of 85
15   to 90 and of course he indicates that you do not
16   exhibit any psychiatric disorder.   He goes through and
17   reviews the life crime with you rather extensively and
18   he also talks about your parole plans, which we'll be
19   getting into.   And then says under assessment of
20   dangerousness, he says within a controlled setting your
21   propensity for violence is considered to be less than
22   that of the Level I inmate and no greater than the
23   average citizen if released at this time.   He does not
24   present any significant risk factors for violence and
25   he indicates you've been programming well and you have
26   viable job skills that should enable you to find
27   employment.   All that remains at the present is for him

37

1   to firm up his parole plans in regards to his future

2   living situation and to have those verified by his

3   fiancée.  So we'll go then -- now to your parole plans.

4   And those parole plans are to parole -- And I believe

5   since your -- I'm not sure -- since 2004 -- exactly

6   when the law changed, but the law's changed and the

7   Board -- you don't have to go back to the county of

8   commitment anymore.  The Board can determine which is

9   the most appropriate.

10          PRESIDING COMMISSIONER BIGGERS:  Two thousand

11   four.

12          DEPUTY COMMISSIONER BENTLEY:  Yeah.  So you plan

13   on paroling into Grass Valley.  Is that correct?

14          ATTORNEY KELLY:  Not at this point.

15   Unfortunately you didn't get my brief in time but let

16   me tell you -- you asked Mr. Gzikowski -- came in if he

17   was angry.  He's been through a lot in the past couple

18   of years.  I held onto a property that was the most

19   incredible parole possibility I could come up with.  I

20   owned an inn and I had a separate residence that was a

21   self-contained block.  I owned a city block.  When his

22   parole was denied, I couldn't maintain it alone.  I

23   work fulltime as an attorney.  I had a child who was a

24   victim of violent crime who I'm caring for.  And I just

25   couldn't do it.  I had to sell it.  I almost went

26   bankrupt.  So that is gone.  I no longer own that

27   property.  Because of the way things happen, it puts us

38

1    in kind of a catch-22.  I would do anything to help

2    John with parole.  I would relocate.  I would do

3    anything because I firmly believe he belongs out of

4    prison.  I have the financial capacity to move.  I have

5    money in the bank.  I could relocate.  My license is

6    good anywhere.  I don't think he should go back to San

7    Francisco.  I think that --

8        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  Bottom

9    line, today, if he were to be released, where would he

10   go?

11       **ATTORNEY KELLY:**  Well if you tell me -- if he

12   was released, he'd go home with me and I'd put him --

13       **DEPUTY COMMISSIONER BENTLEY:**  (Inaudible).

14       **ATTORNEY KELLY:**  -- on my private plane.  San

15   Francisco.  And I could move in two days.

16       **DEPUTY COMMISSIONER BENTLEY:**  Okay.

17       **ATTORNEY KELLY:**  To answer your question.  I

18   think he should be in a rural setting.  That's what he

19   wants.  He's been sending out letters to San Francisco

20   based on the last ruling, it said it had to be, you

21   know, San Francisco.  But it's not -- I don't think it

22   is an appropriate place.

23       **PRESIDING COMMISSIONER BIGGERS:**  That was

24   changed in 2004 (inaudible) mentioned.

25       **ATTORNEY KELLY:**  And that's really good news to

26   me.  I think that he would do fine outside of the city.

27   And you know, you and I both know, if you approved him

39

1   today, it would probably be four months before it goes

2   through the procedure.  In that four month period

3   (inaudible).

4       **PRESIDING COMMISSIONER BIGGERS:**  (Inaudible)

5   change.

6       **ATTORNEY KELLY:**  A lot can change.  But you

7   know, in the meantime I've gone back to San Francisco

8   because I make better money there and I'm a renter so I

9   could move in five minutes.  I have a month to month

10  lease.

11      **DEPUTY COMMISSIONER BENTLEY:**  Okay.  All right.

12  Now, you have sent letters concerning employment.

13  Correct?

14      **INMATE GZIKOWSKI:**  Yes.

15      **DEPUTY COMMISSIONER BENTLEY:**  Okay.  And do you

16  have any response from any of these?

17      **INMATE GZIKOWSKI:**  The reason I wrote to San

18  Francisco was it's hard to get offers of jobs when you

19  don't know if you're getting out.

20      **DEPUTY COMMISSIONER BENTLEY:**  (Inaudible).

21      **INMATE GZIKOWSKI:**  So what I did was (inaudible)

22  information --

23      **ATTORNEY KELLY:**  (Inaudible).

24      **INMATE GZIKOWSKI:**  Yeah.

25      **ATTORNEY KELLY:**  There are responses from the

26  Northern California Service League, explain their --

27  what they're able -- help people, parolee employment

1    programs, also from (inaudible) CETA services.

2        **INMATE GZIKOWSKI:**  Let me interject here.  I

3    wrote the Northern California Service in San Francisco

4    (inaudible) information and they (inaudible) what's

5    called (inaudible) Job Program which I was told about

6    in DVI in the early '90s when (inaudible) development.

7    What that was for (inaudible) guys who did long terms

8    get out and find jobs, job assistance (inaudible).  But

9    they have a new program now, it's been going on for

10   five years called the Parolee Employment Program,

11   called PEP.  And this is all throughout the state and

12   it works on the auspices of the California Department

13   of Corrections & Rehabilitation and Parole Services

14   (inaudible) direct umbrella (inaudible) Employment

15   Development Department.  According to these people in

16   San Francisco, every time we have access to these

17   programs (inaudible) just about went bankrupt the last

18   time (inaudible) again.  The State (inaudible).  They

19   have programs (inaudible) employers, housing, tools,

20   work clothes (inaudible) custody.

21       **DEPUTY COMMISSIONER BENTLEY:**  Do you want to

22   take a recess?

23       **ATTORNEY KELLY:**  No, that's okay.  I think we'd

24   like to do this but I think, you know, you raised this

25   issue and so I'm going to throw it out there.  I am not

26   a stupid person or an idiot.  I met John through

27   someone I knew in Hells Angels who said will you go

1   into DVI and meet somebody and help him in a divorce.

2   I'm a divorce lawyer.  This is not my bailiwick.  I was

3   blown away by the fact that he still has heart and

4   spirit in spite of what he'd been through.  I was very

5   taken by his decency as a human being, in spite of all

6   the years in prison that he still maintained a soul.  I

7   was Quaker by nature.  I believe in the goodness in

8   people.  I'm sometimes proven wrong but not too often.

9   My 88-year-old mother came and visited (inaudible) my

10  family thought I was crazy until they met him.  This is

11  a man who has managed to maintain friends despite being

12  locked up for 28 years because he has an ability to

13  communicate.  His letters --

14      **DEPUTY COMMISSIONER BENTLEY:**  You're going to

15  have an opportunity to make a closing statement.

16      **ATTORNEY KELLY:**  Okay.

17      **DEPUTY COMMISSIONER BENTLEY:**  (Inaudible) kind

18  of think you're kind of getting into.

19      **PRESIDING COMMISSIONER BIGGERS:**  One of the

20  things I want to tell you is I did not call you crazy.

21  I didn't mention that.

22      **ATTORNEY KELLY:**  No, no, I'm not suggesting you

23  did.

24      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  All

25  right.

26      **ATTORNEY KELLY:**  But you know, I have certainly

27  heard it and I've certainly -- I mean, I had district

42

1  attorneys in my home on New Year's Eve who think I'm

2  probably --

3         **PRESIDING COMMISSIONER BIGGERS:**  Just for the

4  record --

5         **ATTORNEY KELLY:**  -- certifiable.

6         **PRESIDING COMMISSIONER BIGGERS:**  -- (inaudible)

7  say I called you crazy.

8         **ATTORNEY KELLY:**  No, no.  Please, I'm not

9  suggesting it.

10        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

11        **ATTORNEY KELLY:**  But you know I can see where

12 that would be a concern.  The bottom line is I'm an

13 officer of the court and I will be deeply involved with

14 John upon his release no matter what.  And I believe he

15 has everything in the world to come home to.

16        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

17        **INMATE GZIKOWSKI:**  And also, paroling back to

18 San Francisco is going to put me into a conflict --

19 contact with certain individuals who I don't want to be

20 around.  I don't want to say their names.  I understand

21 the rules of parole.  I don't want to be in a position

22 where (inaudible) Jane, as an example, she has clients

23 coming to her house who are felons, ex-felons,

24 etcetera.  That's going to be a conflict to the parole

25 officer herself.  If I go back to San Francisco, guys

26 who have recently been arrested, they're out on bail.

27        **DEPUTY COMMISSIONER BENTLEY:**  We already

1    explained that to you, that you no longer have to go

2    back to San Francisco.

3         **INMATE GZIKOWSKI:**  Great.

4         **DEPUTY COMMISSIONER BENTLEY:**  That the Board

5    will determine what is the appropriate place but we

6    need to see what it is.

7         **INMATE GZIKOWSKI:**  If you could parole me

8    directly to the custody of the parole officer.

9         **DEPUTY COMMISSIONER BENTLEY:**  We can't do that.

10        **INMATE GZIKOWSKI:**  And have him implement this

11   program.

12        **PRESIDING COMMISSIONER BIGGERS:**  We can't do

13   that.

14        **DEPUTY COMMISSIONER BENTLEY:**  We can't do that.

15        **ATTORNEY KELLY:**  Okay.  If you -- The answer to

16   your question is any place that -- I would frankly look

17   probably at Lake County, which is quite rural.  It's

18   within two hours of San Francisco.  And if he's

19   approved, I will make sure there's housing.

20        **PRESIDING COMMISSIONER BIGGERS:**  We need to see

21   that, that you have a residence.

22        **ATTORNEY KELLY:**  Okay.  I can't -- I am not

23   going to lay out the money for residence until he's

24   paroled.

25        **PRESIDING COMMISSIONER BIGGERS:**  Okay.

26        **ATTORNEY KELLY:**  But if they say he's approved,

27   it would be Lake County.  I can tell you that right

44

1    now.  I have a son who is a contractor who could hire

2    him like that.  But I can't do it and I'm not going to

3    go rent a house, it's a one year lease.  I cannot

4    commit to that until I know --

5         **INMATE GZIKOWSKI:**  You know, what happened last

6    time even my (inaudible) got scared.  These are tough

7    guys out there, you know, (inaudible), John, we get you

8    a job, we can't keep the job open.  We get you a place

9    to stay, we can't do this.

10        **PRESIDING COMMISSIONER BIGGERS:**  Well, you keep

11   bringing up about what happened last time.  This is a

12   new Panel.  We need to see where you're going to parole

13   to, whether you have an adequate place to live and do

14   you have any job offers.

15        **ATTORNEY KELLY:**  And what I'm saying is you're

16   asking him to get somebody to hold a job for up to six

17   months.

18        **PRESIDING COMMISSIONER BIGGERS:**  Doesn't have to

19   hold a job.

20        **ATTORNEY KELLY:**  (Inaudible).

21        **PRESIDING COMMISSIONER BIGGERS:**  We have inmates

22   come in to see us all the time that have letters

23   indicating that they will in fact hire somebody

24   (inaudible).

25        **ATTORNEY KELLY:**  This (inaudible) --

26        **PRESIDING COMMISSIONER BIGGERS:**  That is a --

27        **ATTORNEY KELLY:**  Okay.

45

1        **PRESIDING COMMISSIONER BIGGERS:**  That is a

2    program that has certain qualifications that he must

3    meet.  I'm talking about letters from private

4    employers.  Please go ahead.

5        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  All right.

6    Let me go ahead and get into the petitions here.  And

7    you have petitions here from people all over the world,

8    right?

9        **ATTORNEY KELLY:**  Correct.

10       **DEPUTY COMMISSIONER BENTLEY:**  Are they contacts

11   that you've made I'm assuming?

12       **ATTORNEY KELLY:**  Not necessarily me.  People are

13   aware of this.  I mean there are boxes of this.  If you

14   looked at the whole file, I suspect there's probably a

15   couple of file boxes full of petitions from everywhere.

16       **DEPUTY COMMISSIONER BENTLEY:**  Okay.  Germany

17   (inaudible).

18       **ATTORNEY KELLY:**  Germany, England.

19       **DEPUTY COMMISSIONER BENTLEY:**  Canada.  Well

20   somehow they had to know about it.

21       **ATTORNEY KELLY:**  I go to motorcycle rallies.

22       **DEPUTY COMMISSIONER BENTLEY:**  Okay.  Okay.

23       **ATTORNEY KELLY:**  They're not all motorcyclists.

24   There are a lot of women on there.  I assure you

25   they're not club members (inaudible).

26       **DEPUTY COMMISSIONER BENTLEY:**  Okay.

27       **PRESIDING COMMISSIONER BIGGERS:**  Do they know

46

1    the inmate?

2         **ATTORNEY KELLY:**  They know of him through

3    writings and through my discussions.

4         **DEPUTY COMMISSIONER BENTLEY:** All right.   Well

5    anyway --

6         **ATTORNEY KELLY:**  Prolific writer.

7         **DEPUTY COMMISSIONER BENTLEY:**  -- there's a lot

8    of pages and they're from all these different

9    countries--

10        **PRESIDING COMMISSIONER BIGGERS:**  Thank you.

11        **DEPUTY COMMISSIONER BENTLEY:**  -- indicated.

12   Okay.  Anything else about parole plans?

13        **ATTORNEY KELLY:**  No, except that I could

14   guarantee this Board if you give him parole, within a

15   week I will have a house and a job for him.

16        **DEPUTY COMMISSIONER BENTLEY:**  Okay.

17        **ATTORNEY KELLY:**  But I need to know that he's

18   released before I ask those favors.

19        **DEPUTY COMMISSIONER BENTLEY:**  Okay.  All right.

20   We sent out 3042 Notices, those out go out to the

21   agencies that would have an interest in this hearing.

22   We didn't receive any letters in response to those.  We

23   do have the Deputy District Attorney from San Francisco

24   who has responded to the notice and (inaudible) person.

25   So with that I'll return to the Chair.

26        **PRESIDING COMMISSIONER BIGGERS:**  You indicated

27   when you were asked about the self-help program and

1   what have you done since the last hearing, you

2   indicated you hadn't done anything and the reason you

3   didn't do anything, I didn't quite catch that.  Would

4   you please clarify that for me please?

5       **INMATE GZIKOWSKI:**  I'm tired and burnt out.  I

6   feel it's hopeless.

7       **PRESIDING COMMISSIONER BIGGERS:**  You don't feel

8   that you can better yourself by --

9       **INMATE GZIKOWSKI:**  No, I feel it's hopeless.

10      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  At this

11  point then I'm going to ask the District Attorney, do

12  you have any questions for the inmate?

13      **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  Yes.

14      **PRESIDING COMMISSIONER BIGGERS:**  Thank you.

15      **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**

16  Commissioners, I'd like you to ask the inmate,

17  according to this statement, the driver of the car that

18  threatened him, pulled out a gun and threatened him

19  with it.  Can he explain why there was no gun found in

20  the car or with the people that he brutally murdered?

21      **PRESIDING COMMISSIONER BIGGERS:**  Sir.

22      **INMATE GZIKOWSKI:**  No.

23      **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  I have no

24  other questions.

25      **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  Do

26  you have any questions for the inmate, ma'am?

27      **ATTORNEY KELLY:**  John, you feel at this point if

1   you were released from prison that you could lead a

2   productive life?

3          **INMATE GZIKOWSKI:**  Sure I could.

4          **ATTORNEY KELLY:**  I don't have anything else

5   other than some statements I'd like to make on the

6   record.

7          **PRESIDING COMMISSIONER BIGGERS:**  Well, you can

8   do that in closing (inaudible).

9          **ATTORNEY KELLY:**  I understand.

10          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  At this

11   point then I'm going to ask the District Attorney to

12   close please.

13          **DEPUTY DISTRICT ATTORNEY UNDERWOOD:**  The

14   District Attorney feels that it is not reasonable to

15   expect that parole should be granted at -- hearing at

16   this time.  Numerous factors include the offense which

17   has been gone over, the fact that there was multiple

18   victims, the defendant had an opportunity not to

19   proceed, he didn't have to go back and kill these

20   people.  He further said that there was a gun, that the

21   people that he murdered exhibited a gun.  However,

22   there was no gun found in the car on these individuals.

23   We don't even know that he ended up murdering the

24   people who he said threatened him.  And the other thing

25   that we object to is that -- the other reason we feel

26   that he's not suitable is because he hasn't done any

27   programs since 1999 that I could find.  I'm not -- I do

49

1    not have advantage of the letters that were provided

2    today, but I reviewed the file and I didn't find any

3    programs or anything since 1999.  And the last thing is

4    the lack of parole plans.  There is no letter from the

5    attorney's brother even saying that he would give him a

6    job if he was paroled to the Clear Lake -- none of

7    these letters exist.  And on that basis, the District

8    Attorney's office is objecting to the granting of

9    parole

10          **PRESIDING COMMISSIONER BIGGERS:**  All right.

11    Thank you.  Miss Kelly.

12          **ATTORNEY KELLY:**  Penal Code 3041 is pretty

13    clear.  It says the Board shall set a release date

14    unless it determines that the gravity of the current

15    convicted offense or offenses or the timing is such

16    that there's a consideration of public safety.  Every

17    single psychological report going back to the early

18    period of incarceration indicates that Mr. Gzikowski

19    has less potential for future violence than your

20    average citizen.  The fact that he hasn't done a

21    program since 1999, he's done every program.  If

22    (inaudible) come up with a new program, that'd be

23    great.  But he's done every single program.  He's

24    jumped through every loop you've asked him to do.

25    Every time he's goes through one, they raise the hoop

26    just a little bit higher.  We had parole plans.  We had

27    excellent parole plans.  It almost cost me 60 years of

50

1    savings.  You asked somebody to do something kind of
2    ass backwards.  Get parole plans and then we'll release
3    you but you have to go through -- it's at least six
4    months, so pay rent on a house or buy a house you may
5    have to sell and get a job lined up that you might not
6    be able to take.  I don't think that's fair.  I have a
7    son who's sitting in a motel room in town who is a
8    general contractor, employs a number of people in Lake
9    County who could be here in five minutes and tell you
10   he'd hire him the day he's out.  He's a skilled person.
11   He has a skill as a welder.  Welders have no problems
12   finding jobs, even those who have committed crimes.  I
13   have tremendous sources and resources to help him if
14   he's released.  I can't put my family at jeopardy any
15   longer until we have a date.  So you know, the last
16   time we came here, I know you tell me it's irrelevant,
17   but we were not probably as angry as I feel today.  It
18   is difficult.  It is difficult to have a date given and
19   then pulled away from you again and to lose a great
20   deal in the process.  John has a lot to come home to.
21   You look at the statistics and you read the paper and
22   you wonder what kind of world we live in where people
23   go to jail (inaudible) throw away the key.  This is
24   California.  It makes no sense to me as a human being.
25   (Inaudible) should really make you do a double take.  I
26   hope this new Board does take the initiative and does
27   look at what's going on in California prisons because

1    it's absurd to the rest of the world, we have people

2    rotting in here and we have a guy who's been here 28

3    years on a seven to life, and it is not appropriate to

4    make it life without the possibility of parole.  He was

5    not sentenced to that.  Now I could go on for hours on

6    statistics.  I'm hoping you're aware of it.  And I hope

7    you hear -- hear what's going on in the world that says

8    this has got to stop.  We can't ship people to Arizona

9    because are prisons are full.

10        **PRESIDING COMMISSIONER BIGGERS:**  Ma'am, your

11   closing statement has to do with his suitability.

12   (Inaudible) --

13        **ATTORNEY KELLY:**  I think his suitability --

14        **PRESIDING COMMISSIONER BIGGERS:**  -- California.

15        **ATTORNEY KELLY:**  -- has been shown through --

16        **PRESIDING COMMISSIONER BIGGERS:**  All right.

17   Okay.

18        **ATTORNEY KELLY:**  -- for years.

19        **PRESIDING COMMISSIONER BIGGERS:**  All right.

20   Mr. Gzikowski, you have the opportunity now to tell

21   this Panel why you feel you're suitable for parole,

22   sir.

23        **INMATE GZIKOWSKI:**  I've said enough.  Thank you.

24        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Then

25   we'll go into deliberations.

26                    **R E C E S S**

27                      --oOo--

1     **CALIFORNIA BOARD OF PAROLE HEARINGS**

2     **D E C I S I O N**

3     **DEPUTY COMMISSIONER BENTLEY:** We are on record.

4     **PRESIDING COMMISSIONER BIGGERS:** Okay. Let the

5     record reflect that everyone that was in the room prior to

6     us going into deliberations are now back in the room. In

7     the matter of Mr. John Gzikowski, G-Z-I-K-O-W-S-K-I, CDC

8     number D-00666, the Panel has reviewed all the information

9     received from the public and relied on the following

10    circumstances in concluding the prisoner is not suitable

11    for parole, would pose an unreasonable risk of danger to

12    society or a threat to public safety if released from

13    prison. This is going to be a one year denial. The Panel

14    looked at the commitment offense which we felt was done in

15    an especially cruel, brutal, cold blooded and heinous

16    manner that demonstrated to this Panel that the inmate had

17    no regard for human life. This one done primarily because

18    on April 20, 1978, when the victims, Mr. Raymond Velonza,

19    V-E-L-O-N-Z-A, and Gary Orasis, O-R-A-S-I-S, were parked

20    on Market Street, the inmate and his codefendant stopped

21    next to their car and he pulled out a shotgun and shot the

22    two victims who were seated in the car. The motive for

23    the crime we felt was very trivial in relationship to the

24    offense. It appeared that the committed offense was done

25    primarily because he was disrespected which he interpreted

26    to be a threat, and this was taken from the probation

27    **JOHN GZIKOWSKI   D-00666   DECISION PAGE 1   1/3/07**

53

1    officer's report.  The inmate failed to profit from
2    society's previous attempts to correct his criminality.
3    He had a prior prison term for selling a controlled
4    substance.  His other priors included primarily -- for
5    vehicle violations and he did also have some probation as
6    an adult.  The inmate has programmed fairly well.
7    However, he hasn't programmed here recently, since his
8    last hearing.  He does have three vocations, two
9    vocations, excuse me.  Machine Repair and he's also a
10   Journeyman Welder.  He has taken some college courses.  He
11   (inaudible) participated in beneficial self-help and
12   therapy but as he stated, and this is from the inmate's
13   perspective, that he doesn't feel -- he said he's done
14   everything and he's burnt out.  He has two 128 counseling
15   chronos and four serious 115's with the last being in
16   February of '03 for excessive contact with his attorney.
17   The psychological report dated April 26, 2004 authored by
18   Dr. Payne wasn't (inaudible) supportive of release, and
19   I'm quoting, he said that: "In a controlled setting the
20   inmate's propensity for violence is considered to be less
21   than that of the Level I inmate and no greater than that
22   of the average citizen."  And his parole plans, this Panel
23   doesn't feel that you had any parole plans, sir.  I know
24   that your attorney indicated that it appears that the --
25   we're doing this, and I'm quoting from the attorney, "ass
26   backwards."  However, this Panel feels that we need to
27   **JOHN GZIKOWSKI   D-00666   DECISION PAGE 2   1/3/07**

54

1    know exactly where you're going to go, what you're going
2    to be doing.  I have no doubt -- We have no doubts that
3    your attorney's son could in fact give you a job.
4    However, we like to see that in writing on letterhead
5    indicating exactly what you're going to be doing, how much
6    you're going to get paid because we don't want to put
7    anybody out there on the street on the whim of someone
8    saying my son will hire you or whatever.  We understand
9    that you do have marketable skills and you can be
10   employed, but we still need to know where you're going to
11   go and what you're going to be doing.  So you really need
12   to firm up your parole plans before your next hearing.
13   The hearing Panel on the 3042 Notices indicated -- we
14   found that the District Attorney of San Francisco
15   indicated an opposition to a finding of parole
16   suitability.  Nevertheless, we want to commend you for
17   obtaining your two vocations, for getting your college
18   credits and also for being disciplinary-free since 2003.
19   And I'm going to ask Deputy Commissioner to say a few
20   words please.

21        **DEPUTY COMMISSIONER BENTLEY:**  Yeah, I've been at
22   this job a long time and I just wanted to kind of point
23   out a few things.  I know you're frustrated.  You also
24   have to recognize that when you come into these hearings
25   you've got to make the best presentation that you can.
26   And you came with a real bad attitude today which
27   **JOHN GZIKOWSKI    D-00666    DECISION PAGE 3    1/3/07**

55

1    demonstrates kind of a propensity that could lead to

2    violence with an attitude like that.  So I want you to

3    consider that.  Put your best foot forward when you come

4    into these hearings.  I'm sure when you were given a date

5    you didn't come in with the attitude that you've showed

6    today.  That's all I have.

7            **PRESIDING COMMISSIONER BIGGERS:**  All right.

8    However, these positive aspects of your behavior do not

9    outweigh the factors of unsuitability.  And again, this is

10   going to be a one year denial.  The Panel's going to

11   recommend that you remain disciplinary-free.  Be involved,

12   when available, anything vocationally that you can do.

13   Participate in self-help  And I'm also going to point out

14   to you, sir, I agree, I know that you're frustrated and it

15   has been a struggle as your attorney mentioned about the

16   fact that you, you know, that she's almost lost

17   everything.  But at the same time, you cannot come in here

18   displaying the attitude that you did today (inaudible)

19   Panel.  All right.  That concludes the hearing.  The time

20   is now two minutes after ten.  Good luck to you, sir.

21                    **A D J O U R N M E N T**

22                         --oOo--

23   **PAROLE DENIED ONE YEAR**

24   **THIS DECISION WILL BE FINAL ON:**___MAY 0 3 2007___

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **JOHN GZIKOWSKI   D-00666   DECISION PAGE 4   1/3/07**